## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CHEMGUARD, LTD.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION 09-1155** |
| **U.S. FOAM, INC. d/b/a** | § | |
| **U.S. FOAM TECHNOLOGIES, INC.,** | § | |
| **ALDEN D. OZMENT and ANGELA C.** | § | |
| **OZMENT,** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF CHEMGUARD, LTD.'S BRIEF IN SUPPORT OF ITS APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**Craig W. Weinlein**
Texas State Bar No. 21095500
cweinlein@ccsb.com
**Prescott W. Smith**
Texas State Bar No. 24013534
psmith@ccsb.com
**CARRINGTON, COLEMAN, SLOMAN &**
  **BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202
(214) 855-3094; Fax:  (214) 953-5822

*Of Counsel:*

**Kirk W. Watkins**
kwatkins@wcsr.com
Atlantic Station
271 17th Street NW
Suite 2400
Atlanta, Georgia 30363
**Jacob S. Wharton**
jwharton@wcsr.com
One West Fourth Street
Winston-Salem, North Carolina 27101
**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
(404) 888-7414; Fax: (404) 870-4836

# TABLE OF CONTENTS

I. INTRODUCTION AND FACTUAL BACKGROUND.................................................... 1

    A.    Introduction......................................................................................... 1

    B.    Fire-Fighting Foam Concentrates and Chemguard's Industry Certified
        Products............................................................................................... 2

    C.    Underwriters Laboratories Listing of Class B Fire-Fighting Foam
        Concentrates....................................................................................... 5

    D.    Classification of Class A Foam Concentrates and Analysis Under U.S.
        Forest Service Specification 5100-307a ............................................ 7

    E.    Customers Depend on Product Literature and Packaging to Determine if a
        Fire-Fighting Foam is UL Listed or Meets MIL-F-24385F ................... 7

    F.    Chemguard Discovers U.S. Foam Product Carrying Counterfeit UL
        Listing Marks and Control Numbers Associated with Chemguard and
        Ansul ................................................................................................. 8

    G.    Chemguard Discovers U.S. Foam Product Claiming to Meet Military
        Specification MIL-F-24385F Does Not Meet the Specification............. 11

    H.    Chemguard Discovers that U.S. Foam's First Strike A/B Foam
        Concentrate Cannot Perform as a Class A and Class B Foam.............. 14

II. ARGUMENT AND AUTHORITY .............................................................. 15

    A.    The Standard for Determining Whether to Grant an Interlocutory
        Injunction. .......................................................................................... 15

    B.    Chemguard Has Demonstrated a Substantial Likelihood of Success on the
        Merits of Its Claims Against U.S. Foam for False Advertising and Unfair
        Competition........................................................................................ 16

        1.    Counterfeiting UL's Listing Mark Constitutes False Advertising,
            Unfair Competition, and a Threat to Public Safety...................... 16

    C.    There is a Substantial Likelihood that Chemguard will Succeed on the
        Merits of Its Claims............................................................................. 18

        1.    Misuse of a UL Listing Mark and Control Number constitutes false
            advertising and unfair competition............................................ 18

        2.    Misrepresenting that a Product Meets MIL-F-24385F when it does
            not Constitutes False Advertising, Unfair Competition, and a
            Public Health Threat. ............................................................... 20

        3.    Misrepresenting the Performance of First Strike A/B Constitutes
            False Advertising, Unfair Competition, and a Public Health Threat. ....... 20

    D.    Primarily, a Temporary Restraining Order And Preliminary Injunction
        Will Serve, not Disserve, the Public Interest. ..................................... 21

1.  Chemguard and the Public will Suffer a Substantial Threat of
    Irreparable Harm if an Injunction is Not Entered. .................................... 23

2.  The Threatened Injury to Chemguard and the Public Outweighs
    Any Injury U.S. Foam May Suffer if a Restraining Order is Issued......... 24

E.  The Court Should Issue a Restraining Order With No Bond Requirement,
    or Only a Nominal Bond Requirement. ............................................................ 24

III. CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Black & Decker, Inc. v. Pro-tech Power, Inc.,*
26 F. Supp. 2d 834 (E.D. Va. 1998)...................................................................... 23

*Burndy Corp. v. Teledyne Indus., Inc.,*
584 F. Supp. 656 (D. Conn. 1984) ...................................................................... 19

*Burndy Corp. v. Teledyne Indus., Inc.,*
748 F.2d 767 (2d Cir. 1984)................................................................................. 23

*California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency,*
766 F.2d 1319 (9th Cir. 1985).............................................................................. 24

*Canal Auth. of Florida v. Callaway,*
489 F.2d 567 (5th Cir. 1974) (en banc)............................................................... 15

*DSC Commc'ns Corp. v. DGI Tech., Inc.,*
81 F.3d 597 (5th Cir. 1996)................................................................................. 15

*Gordon & Breach Science Publishers S.A. v. Am. Inst. of Physics,*
859 F. Supp. 1521 (S.D.N.Y. 1994)..................................................................... 16

*Healthpoint, Ltd. v. Ethex Corp.,*
2004 WL 2359420 (W.D. Tex. July 14, 2004) ..................................................... 18

*Healthpoint, Ltd. v. Ethex Corp.,*
273 F. Supp. 2d 817 (W.D. Tex. 2001)................................................................ 17

*Healthpoint, Ltd. v. Stratus Pharms., Inc.,*
273 F. Supp. 2d 769 (W.D. Tex. 2001)................................................................ 23

*Heather K. v. City of Mallard,*
887 F. Supp. 1249 (N.D. Iowa 1995)................................................................... 22

*Hukafit Sportswear v. Banff, Ltd.,*
1985 WL 5943 (S.D.N.Y. 1985)........................................................................... 18

*Ideal Instruments, Inc. v. Rivard Instruments, Inc.,*
479 F. Supp. 2d 968 (N.D. Iowa 2007)................................................................ 22

*Kaepa, Inc. v. Achilles Corp.,*
76 F.3d 624 (5th Cir. 1996)................................................................................. 24

*Logan v. Burgers Ozark Country Cured Hams, Inc.*,
    263 F.3d 447 (5th Cir. 2001) .................................................................................. 16

*MCW, Inc. v. Badbusinessbureau.com, L.L.C.*,
    2004 WL 833595 (N.D. Tex. April 19, 2004) ................................................. 16, 17

*Nabisco, Inc. v. PF Brands, Inc.*,
    191 F.3d 208 (2d Cir. 1999) .................................................................................. 18

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
    105 F.3d 841 (2d Cir. 1997) .................................................................................. 17

*Pem-America, Inc. v. Sunham Home Fashions, LLC*,
    2003 WL 22964908 (2d Cir. Dec. 12, 2003) ....................................................... 18

*Petro Franchise Systems, LLC v. All Am. Properties, LLC*,
    607 F. Supp. 2d 781 (W.D. Tex. 2009) ................................................................ 22

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ............................................................................ 16, 17

*Playskool, Inc. v. Product Development Group, Inc.*,
    699 F. Supp. 1056 (E.D.N.Y. 1988) .................................................................... 22

*Summers v. Washington State Dept. of Ecology*,
    132 F. Supp. 2d 896 (E.D. Wash. 1999) .............................................................. 22

*Taylor Publ'g Co. v. Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000) ............................................................................ 18, 20

*Tilton v. Smith*,
    827 F. Supp. 404 (N.D. Tex. 1993) ...................................................................... 16

*United States v. Lit Drug Co.*,
    333 F. Supp. 990 (D.N.J. 1971) ........................................................................... 22

*United States v. Zheng Xiao Yi*,
    460 F.3d 623 (5th Cir. 2006) ............................................................................ 17, 19

## STATUTES

15 U.S.C. § 1125(a)(1)(B) .......................................................................................... 16, 19

Lanham Act, 15 U.S.C. § 1125(a)(1)(A) ..................................................................... 17, 19

**OTHER AUTHORITIES**

Rule 65(c) .................................................................................................................. 24

*Standard for Safety for Foam Equipment and Liquid Concentrates* ............................................. 6

**PLAINTIFF CHEMGUARD, LTD.'S BRIEF IN SUPPORT OF ITS APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Chemguard, Ltd. ("Chemguard") presents this Brief in Support of its Application for Temporary Restraining Order and Preliminary Injunction and respectfully shows the Court:

## I.
## INTRODUCTION AND FACTUAL BACKGROUND

**A.    Introduction**

Chemguard and U.S. Foam, Inc. ("U.S. Foam") both manufacture and sell competing fire-fighting foam concentrates.   U.S. Foam is engaging in false advertising and unfairly competing with Chemguard by:  (1) falsely labeling certain product as listed with Underwriters Laboratories, thus falsely suggesting that the product has been tested and meets industry safety and performance standards; (2) falsely labeling at least one product as meeting stringent military specifications; and (3) and falsely advertising an all-in-one foam concentrate product that will not perform as advertised.  The lives of members of the public and the firefighters that protect the public are, and will continue to be, placed in jeopardy by U.S. Foam's conduct unless enjoined by this Court.  U.S. Foam's conduct is also causing immediate and irreparable harm to Chemguard and defrauding multiple federal, state, and municipal agencies.  Chemguard seeks a temporary and preliminary injunction to prevent the continued sale and distribution of fire-fighting foam concentrates that are falsely labeled   In addition, to ensure that no further harms occur and that danger to the public can be reduced, Chemguard requests that this Court require U.S. Foam to notify its customers and the industry of the false labeling and misrepresentations and order the immediate recall of all falsely labeled U.S. Foam product.

U.S. Foam's conduct is egregious endangering the lives of firefighters across the country, as well as the public they serve, who depend on the foam concentrate product they are using to meet the minimum required safety standards of UL or the even more stringent requirements of

1

military specifications. As shown by the attached declarations, the public is being deceived by the literally false claims of U.S. Foam and, in certain instances, its products fall far short of the representations being made.

**B.     Fire-Fighting Foam Concentrates and Chemguard's Industry Certified Products**

Chemguard manufactures and sells different classes of fire-fighting foam concentrates designed to extinguish specific types of fires. In general, fire-fighting foam concentrates are used to cool fires and coat the fuel source. *See* Appendix at Page 6, ¶ 10.

In the United States, fires are classified into five different categories: Class A fires involve ordinary combustibles such as wood, cloth, rubber, and some plastics. Class B fires involve flammable liquids and gases, such as gasoline, kerosene, jet fuel, and diesel. Class C involve electrical equipment, such as overloaded electrical cables or short-circuiting machinery. Class D involves combustible metals, such as sodium, titanium, and magnesium. Class K involves cooking oil or fat. *See* Appendix at Page 6, ¶ 11. The products at issue in this proceeding relate to Class A and/or Class B fires. Both Chemguard and U.S. Foam offer products in these categories.



**Firefighters Addressing a Class A Fire**

Class A foam concentrates are designed for use on Class A fires. Class A foam concentrates were being marketed in the mid-1980's for fighting wildfires. Favorable experiences led to the acceptance of Class A foam concentrates for fighting other types of Class A fires, including structure fires. *See* Appendix at Page 6, ¶ 12. When proportioned with water, Class A foam concentrates alter water properties, reducing the surface tension and allowing for greater penetration into Class A fuels (wood, cloth, etc.) thereby serving as a wetting agent (the foam concentrate wets, penetrates, and saturates the fuel source). When properly aerated, the foam concentrate forms a foam that clings to surfaces without run off. This allows the water to absorb more heat and provides greater penetration into Class A fuels. *Id.* at ¶ 13.



**Firefighters Battling a Class B Fire**

Class B foam concentrates are designed for use on Class B fires. Class B foam concentrates can be classified in three ways: (1) Non-film forming synthetics, (2) AFFFs (aqueous-film forming form concentrates) and AR-AFFFs (the AR stands for alcohol resistance); and (3) proteins and fluoroproteins. Synthetic foam concentrates are based on synthetic surfactants. A surfactant is a substance that reduces the surface tension or the interfacial tension of water or other aqueous solutions when dissolved in those solutions. Synthetic foam concentrates provide good flow and fast knockdown of flames, but afford limited post-fire security, known as burnback, where the fire re-ignites. *See* Appendix at Page 7, ¶ 14. AFFFs were developed by the U.S. Navy in the 1960's and are water-based and frequently contain sodium alkyl sulfate and/or perfluoro telomere as surfactants. Of the three classifications, AFFFs and AR-AFFFs are generally the most effective. AFFFs and AR-AFFFs are generally defined as products which, when diluted to their intended use level, will yield a spreading coefficient >0 dynes/cm on cyclohexane. A spreading coefficient >0 dynes/cm can cause an aqueous solution to spread and float (form a film) on a less dense hydrocarbon fuel. AR-AFFFs have the added property of being able to resist the attack of water soluble fuels such as alcohols or ketones, and form a vapor suppressing polymeric membrane on the polar fuel surface. *Id.*

Class B AFFF foam concentrates have a low viscosity and form a film that is meant to smother the hydrocarbon fuel source. Class B AFFF foam concentrates only require low energy input to form a high-quality foam film that floats on the surface of flammable liquids and forms a barrier between the liquids, eliminating the exchange of fuel vapors with oxygen. The aqueous film just above the flammable liquids cools the liquid fuel, which helps stop the formation of flammable vapors. The film also precludes oxygen from mixing with the liquids, thereby extinguishing the flames. Class B AFFF foam concentrates provide the fastest knockdown of

hydrocarbon fuel fires, an important factor in crash rescue fire fighting. *See* Appendix at Pages 7-8, ¶ 15. These concentrates provide excellent burnback performance (preventing the re-ignition of a fire). *See* Appendix at Page 8, ¶ 16. Chemguard's Class B AFFF concentrates are available as 1%, 3%, and 6% concentrates for use at the proportioning rate of the product (*e.g.*, 1% would be 1 part concentrate to 99 parts water; 3% would be 3 parts concentrate to 97 parts water). *Id.* at ¶ 17.

Although Class B foam concentrates may be used to extinguish Class A fires, that is not their primary design and thus it is not optimal to use a Class B foam concentrate on Class A fires. Conversely, the use of a Class A foam concentrate on a Class B fire may yield unexpected results, as Class A foam concentrates are not designed to contain the explosive vapors produced by flammable liquids. Thus, the use of a Class A foam concentrate on a Class B fire can exacerbate the fire and its threat to life and property. *See* Appendix at Page 8, ¶ 18.

**C.     Underwriters Laboratories Listing of Class B Fire-Fighting Foam Concentrates**

Underwriters Laboratories ("UL") is an independent non-profit product safety certification organization that has been testing products and writing standards for safety for more than a century. In the year 2008, UL reports that it evaluated more than 93,762 products and made 579,684 follow-up service inspections to manufacturing facilities. There are several different types of UL marks, each with its own specific meaning. One such mark is the UL Listing Mark, shown here:



The UL Listing Mark is one of the most common UL Marks. If a product carries this mark, it means UL found that representative samples of this product met UL's safety

requirements. These requirements are primarily based on UL's own published standards for safety. *See* Appendix at Page 9, ¶ 20.

UL provides a listing for Class B foam liquid concentrates in the product category of "foam liquid concentrate." In the United States, customers that purchase Class B fire-fighting foam concentrate often demand that the foam concentrate be listed with Underwriters Laboratories to ensure that the foam concentrate meets industry safety, quality, consistency, and performance standards. *See* Appendix at Page 9, ¶ 20 and Page 204, ¶ 5. Thus a UL Listing is critical for the commercial success of a Class B foam concentrate. *See* Appendix at Page 9, ¶ 21 and Page 204 ¶ 7.

A listing with UL indicates that a Class B foam concentrate meets industry standards for both safety and performance thus ensuring the quality of products on which the safety of the public and the firefighters using the product depend. *See* Appendix at Page 9, ¶ 22. The UL Listing process for Class B foam concentrates involves an on-site visit from UL representatives who inspect the manufacturing and testing facilities and test representative samples. *Id.* at ¶ 23.

To obtain a UL listing, a sample of a Class B foam concentrate must pass the fire test known as UL 162 , *Standard for Safety for Foam Equipment and Liquid Concentrates*. In general, the fire test set forth in UL 162, like most fire tests, measures speed of extinguishment and resistance to re-ignition (burnback). More specifically, UL 162 requires that the Class B foam concentrate extinguish a Class B fire in a 50 ft$^2$ fire test pan within three minutes and a burnback of no more than 20% of the surface area of the test pan after an additional source of ignited fuel is introduced to the test pan. *See* Appendix at Pages 9-10, ¶ 24, Exhibit A (Page 20).

Chemguard manufactures and sells 21 Class B fire-fighting foam concentrates which are listed with UL. *See* Appendix at Page 10, ¶ 26. UL assigns each manufacturing facility, even if

owned by the same company, a unique control number to be used in association with a class of product made at that manufacturing facility. Chemguard was assigned "86R6" in conjunction with liquid foam concentrates, which include Class B foam concentrates manufactured at Chemguard's Mansfield plant. Similarly, Ansul, Inc. ("Ansul"), a competitor of Chemguard, was assigned "68P6" in conjunction with liquid foam concentrates manufactured at its Marinette (Wisconsin) plant. *See* Appendix at Page 10, ¶ 28. UL provides a database on its website that provides a listing for all products made by a manufacturer that are UL Listed. *See* Appendix at Page 11, ¶ 29, Exhibit B (Page 79).

**D.      Classification of Class A Foam Concentrates and Analysis Under U.S. Forest Service Specification 5100-307a**

UL provides a classification for wetting agents, which are a subset of Class A foam concentrates. Unlike a UL Listing, a product falling into a UL Wetting Classification is only tested to a portion of the NFPA 18 standard. UL is not equipped to perform the corrosion and toxicity tests and, therefore, does not certify compliance with those portions of the NFPA 18 standard *See* Appendix at Page 11, ¶ 30.

**E.      Customers Depend on Product Literature and Packaging to Determine if a Fire-Fighting Foam is UL Listed or Meets MIL-F-24385F**

Fire chiefs, distributors, and those responsible for fire safety as the nation's commercial airports rely upon a manufacturer's product literature and packaging as the primary source to determine if the product is either UL Listed or meets the stringent military specification MIL-F-24385F (discussed below). *See* Appendix at Pages 207-212 (Declaration of Nicky Prejean, President, Southland Fire & Safety Equipment; Declaration of Doug Schaumburg, President, Casco Industries; and Thomas Darley, Vice President of Equipment sales, W.S. Darley & Co.); Page 206, ¶ 13. Indeed, UL states that "[o]nly those products bearing the UL Mark should be

considered to be Listed and covered under UL's Follow-Up Service. ***Always look for the Mark on the product*.**" (emphasis added)  *See* Appendix, Page 11, ¶ 29, Exhibit B (Page 79).

**F.     Chemguard Discovers U.S. Foam Product Carrying Counterfeit UL Listing Marks and Control Numbers Associated with Chemguard and Ansul**

On or about May 14, 2009, Chemguard's Senior Manager – Chemical Technology Randy Hendricksen received a phone call from Captain Richard Daniels with the City of Fountain (Colorado) Fire Department regarding some questions about Chemguard foam unrelated to this action.   While on the phone, Captain Daniels asked Mr. Hendricksen if Chemguard offered an "A/B" foam concentrate similar to the one that he was using.  Mr. Hendricksen was not familiar with any "A/B" foam concentrate so he asked Captain Daniels if the "A/B' foam concentrate that he had was UL Listed.  Captain Daniels said that the product was U.S. Foam's First Strike A/B and that its packaging represented that it was "UL Listed, 86R6."  Mr. Hendricksen immediately recognized "86R6" as Chemguard's UL control number uniquely associated with Chemguard's Mansfield, Texas manufacturing facility.    *See* Appendix at Page 11,  ¶ 32.    Thus began Chemguard's investigation of its claims against U.S. Foam.

Mr. Hendricksen first checked the listing for all U.S. Foam products on the U.L. website. The U.S. Foam First Strike A/B product was not included, indicating that the product was not UL Listed.  *See* Appendix at Page 11, ¶ 33.

In further reaction to Mr. Hendricksen's conversation with Captain Daniels, on or about May 14, 2009, Chemguard purchased a pail of First Strike A/B from U.S. Foam (Lot # 030409) at U.S. Foam's Longview facility.  The labeling on this pail also displays the UL Listing Mark and Chemguard's control number.  An image of the label from that pail of U.S. Foam First Strike A/B is shown below (also *see* Appendix at Pages 12-13, ¶ 34):



**U.S. Foam First Strike Label Front and Back with Extracted UL Portion**

At Mr. Hendricksen's request, the City of Fountain Fire Department soon provided several pails of the U.S. Foam First Strike A/B product to Chemguard's Mansfield facility. *See* Appendix at Page 13, ¶ 35. On May 21, 2009 Chemguard obtained a container of First Strike A/B foam concentrate (Lot #030409) sold by U.S. Foam in Longview, Texas. On June 5, 2009, Chemguard obtained additional containers of foam concentrate sold by U.S. Foam in Longview, Texas. These containers included First Strike 3% AFFF-MS (Lot # 060509), First Strike 3% AFFF (Lot # 012109), First Strike 6% AFFF (Lot #021109), First Strike 3-6% ATC (Lot # 042109), First Strike 3-6% AFFF (Lot # 030209). On June 8, 2009, Chemguard received First

Strike A/B (Lot #  081707) from the City of Fountain (Colorado) Fire Department.  These products were delivered directly to Chemguard's facilities in Mansfield, Texas, where Mr. Hendricksen maintained custody and control of them at Chemguard's facilities in Mansfield, Texas.  *See* Appendix at Pages 13-14, ¶ 36.

A review of the labels on the U.S. Foam product reveals the following:

a.      U.S. Foam is using a UL Listing Mark and Chemguard's control number on "First Strike A/B" product when the product is <u>not UL Listed</u>.  Although the UL Listing Mark includes the Chemguard control number, the product is not manufactured at Chemguard's facility in Mansfield, Texas, and Chemguard has not authorized U.S. Foam to use its control number.  *See* Appendix at Page 14, ¶ 37(a), Exhibits D-F.

b.      U.S. Foam is using a UL Listing Mark and Ansul's control number on First Strike 3% AFFF-MS when the product is <u>not UL Listed</u>.  Although the UL Listing Mark includes the Ansul control number, the product is not manufactured by Ansul.  On June 10, 2009, Steven Hansen and Mitch Hubert, both Ansul employees, confirmed to Chemguard that Ansul does not make product for or sell product to U.S. Foam and that Ansul has not authorized U.S. Foam to use Ansul's control number.  *See* Appendix at Page 14, ¶ 37(b), Exhibits G-J (Pages 124-131).

c.      U.S. Foam is using control numbers uniquely associated with Chemguard on First Strike 3% AFFF and First Strike 3%-6% ATC.  Although these U.S. Foam products appear to be UL Listed, Chemguard has not authorized U.S. Foam to use its control number.  *See* Appendix at Page 15, ¶ 37(c), Exhibits K-P (Pages 132-143).

d.      U.S. Foam is using a third UL control number, "879G," on First Strike 6% AFFF and First Strike 3%-3% AFFF.  U.S. Foam is using this control number inconsistently with UL practice as the products are labeled as manufactured in two different locations, Longview and

Paul's Valley, Oklahoma respectively.   UL assigns a unique control number to each manufacturing location.  *See* Appendix at Page 15, ¶ 37(d), Exhibits Q-V (Pages 144-155).

A product that is labeled as UL listed but is not in fact UL Listed may compromise safety and efficacy when used in the field, thus endangering the safety of firefighters and those they serve.  Although a user might follow directions to use the UL Listed product and expect it to perform as certified by that listing, the U.S. Foam products may fail to meet those specifications when there is a serious and immediate need.  *See* Appendix at Page 15, ¶ 38.

In view of the public safety risks created by U.S. Foam's improper use of the UL Listing Mark, as well as U.S. Foam's improper use of Chemguard's and Ansul's control numbers, Mr. Hendricksen reported the matter to UL on June 11, 2009 using UL's Field Report service.  *See* Appendix at Page 16, ¶ 39.

**G.   Chemguard Discovers U.S. Foam Product Claiming to Meet Military Specification MIL-F-24385F does not Meet the Specification**

There are also fire-fighting foam concentrates which are formulated to meet Military Specification MIL-F-24385F.  Such concentrates are purchased by the military, airports, oil tankers, offshore rigs, and other fire-fighting authorities that demand a foam concentrate designed to extinguish Class B fires even faster than UL Listed Class B foam concentrates.  *See* Appendix at Page 16, ¶ 40, Pages 204-205, ¶ 8.  The specification was created by the U.S. Navy in part to ensure compatibility.  *See* Appendix at Pages 204-205, ¶ 8.  Aircraft fires are frequently life-endangering and the heightened performance of Class B foam concentrate meeting MIL-F-24385 provides the most assurance that lives will not unnecessarily be lost and that property damage can be minimized.  *Id.*  FAA Advisory Circular 150/5210-6D set forth the reasons that the specification was adopted:

> AFFF agents must meet the requirements of Mil-F-24385F. It is important to note that if one vendor's foam is mixed with another vendor's foam in the re-servicing

process, there must be compatibility between foams to prevent gelling of the concentrate.

And states FAA Cert Alert No. 06-20, February 2006:

Any AFFF purchased after July 1, 2006 by an airport operator certificated under Part 139 must meet the Mil Spec as mentioned above. There are several reasons for this requirement. First of all, AFFF has to be compatible when mixed. AFFF manufactured by different manufacturers, although meeting the UL 162 standard, may not be compatible. AFFF meeting the Military Specification will always be compatible with other Military Specification AFFF no matter the manufacturer. Second, AFFF meeting the military specification requires less agent than AFFF meeting UL 162 to extinguish the same size fire. Finally, the requirement to use Mil Spec is in concert with the National Fire Protection Association National Fire Code 403, paragraph 5.1.2.1

*See* Appendix at Pages 204-205, ¶ 8.

U.S. Foam represents that its First Strike 3% AFFF-MS meets MIL-F-24385 in both product literature and on product packaging, *see* Appendix at Page 16, ¶ 41, Exhibits H (Page 126); *see also* Exhibit 1 (Page 128), but the product does not meet MIL-F-24385. On June 8, 2009 Chemguard conducted tests to see if the U.S. Foam First Strike 3% AFFF-MS meets MIL-F-24385F. Chemguard found that the U.S. Foam First Strike 3% AFFF-MS product did not meet the specification because it failed to extinguish the fire called for in the specification within the allotted time. Specifically, a foam concentrate that meets MIL-F-24385F is supposed to extinguish a test-defined fire within **50 seconds** and it took the U.S. Foam First Strike 3% AFFF-MS **81 seconds** to extinguish the fire. Such results indicate a significant failure (the U.S. Foam product took 62% longer to extinguish the fire). Also, the foam concentrate is supposed to extinguish certain portions of the surface area of the fire measured at four different points (10 seconds, 20 seconds, 30 seconds, and 40 seconds). The U.S. Foam First Strike 3% AFFF-MS also failed that portion of the test. *See* Appendix at Page 16, ¶ 42, Exhibits X and Y (Pages 160 and 162). There may be additional deficiencies in the U.S. Foam product, as Chemguard has not tested all aspects of the product. *See* Appendix at Page 16, ¶ 42. As yet

another way to confirm that the U.S Foam First Strike 3% AFFF-MS does not meet MIL-F-24385F, Chemguard also checked to see whether the U.S. Foam First Strike 3% AFFF-MS was listed on the Qualified Products List ("QPL") issued by the U.S. Navy, which lists all products that meet MIL-F-24385. The U.S. Foam First Strike 3% AFFF-MS is not listed. *See* Appendix at Page 17, ¶ 43, Exhibit Z (Page 187). Because the QPL is now maintained as the Qualified Products Database ("QPD"), Chemguard also reviewed the latest QPD, dated June 25, 2008. The U.S. Foam First Strike 3% AFFF-MS is not listed there either. U.S. Foam falsely represents that this product is listed on the QPL. *See* Appendix at Page 17, ¶ 43, Exhibit AA (Page190).

A product that is labeled or represented as meeting MIL-F-24385F but in fact does not meet the specification may compromise safety and efficacy when called upon in the field. The failure to perform up to the military specification can endanger the safety of the public and the firefighters who serve them. *See* Appendix at Page 17, ¶ 44.

Furthermore, products that do not meet MIL-F-24385F, such as U.S. Foam First Strike 3% AFFF-MS, endanger the public and firefighters because firefighters will be applying less effective foam concentrate with their equipment, therefore, requiring a longer application for the same impact. If a foam concentrate does not meet the specification, the firefighters may need additional amounts of foam concentrate to effectively extinguish the fire, and such concentrate may not be available. When foam is applied that is less effective, more total foam concentrate is required. More foam is required because the fire resists the foam's effects. If the foam is ineffective enough, it can be continually applied without extinguishing the fire. The delay or prevention in fire extinguishment by less effective foam concentrate prolongs the fire and endangers the firefighters and the public they are trying to protect. In addition, a fire could more easily re-ignite when not enough foam can be effectively applied to safely secure a Class B fire.

*See* Appendix at Page 17, ¶ 45. Moreover, foam concentrate that does not meet MIL-F-24385F may not be compatible with foam concentrate that does meet MIL-F-24385F. *See* Appendix at Pages 204-205, ¶ 8.

In addition to marketing the U.S. Foam First Strike 3% AFFF-MS as meeting MIL-F-24385F, U.S. Foam has listed First Strike 3% AFFF-MS with the Government Services Administration ("GSA") under GSA Contract GS-07F-5635P. Such listing falsely indicates to the federal government, the relevant consuming public, and firefighters that the product meets MIL-F-24385F. A search for "AFFF mil spec" on the GSA website returns the U.S. Foam product immediately below Chemguard's military specification foam concentrate. As discussed above, at the least, tests show that the U.S. Foam First Strike 3% AFFF-MS does not meet MIL-F-24385F. *See* Appendix at Page 18, ¶ 46, Exhibit AB (Page 196).

As stated above Section II(E), purchasers look to the labeling and marketing of a product to determine if it meets MIL-F-24385. *See* Appendix at Pages 207-212 (Prejean, Schaumburg and Darley Declarations).

**H.     Chemguard Discovers that U.S. Foam's First Strike A/B Foam Concentrate Cannot Perform as a Class A and Class B Foam**

U.S. Foam represents that its "First Strike A/B" foam concentrate performs to industry standards as both a Class A and Class B foam concentrate. *See* Appendix at Page 18, ¶ 48, Exhibit AC (Page 200). Chemguard tested U.S. Foam's "First Strike A/B" pursuant to U.S. Forest Service Specification 5100-307a since this is a common test used to assess the efficacy of Class A foam concentrate, which First Strike A/B claims to be. U.S. Foam's "First Strike A/B" product failed this test. Specifically, the test requires that a 1% solution of product must wet a cotton skein weighted by a 1.5g hook in less than 20 seconds. First Strike A/B took on

average over 24 minutes to complete this test or **approximately 73 times as long**. *See* Appendix at Page 18, ¶ 48, Exhibit C (Page 85).

A mix of Class A foam concentrate and a Class B foam concentrate would not be expected to perform as represented by U.S. Foam. This is because when mixed, Class A foam concentrates and Class B foam concentrates usually interfere with the primary fire-fighting attributes of each other, frequently rendering each foam concentrate less effective than that foam concentrate standing alone – whether a Class A or Class B fire is to be extinguished. *See* Appendix at Page 19, ¶ 49.

Moreover, a dangerous situation could be created if firefighters mixed First Strike A/B, which has Class A foam concentrate properties, with a Class B foam concentrate and expected it to perform like a pure Class B foam concentrate. The mixed First Strike A/B and Class B foam concentrate would destroy or greatly reduce the effectiveness of the Class B foam concentrate to which First Strike A/B was added thereby potentially placing the lives of firefighters and public in danger. *See* Appendix at Page 19, ¶ 50.

## II.
## ARGUMENT AND AUTHORITY

**A.    The Standard for Determining Whether to Grant an Interlocutory Injunction.**

There are four requisites for granting a interlocutory injunction. To prevail, Chemguard must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of immediate and irreparable harm for which it has no adequate remedy at law; (3) that greater injury will result from denying the preliminary injunction than from its being granted; and (4) that a preliminary injunction will not disserve the public interest. *DSC Commc'ns Corp. v. DGI Tech., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996); *Canal Auth. of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (en banc). The same factors apply in proceedings for temporary

restraining orders. *See Villas at Parkside Partners v. City of Farmer's Branch*, No., 2007 WL 1498763, at *3 (N.D. Tex. May 21, 2007) (applying factors in temporary restraining order proceeding); *Tilton v. Smith*, 827 F. Supp. 404, 406 (N.D. Tex. 1993) (same).

**B.      Chemguard Has Demonstrated a Substantial Likelihood of Success on the Merits of Its Claims Against U.S. Foam for False Advertising and Unfair Competition**

**1.      Counterfeiting UL's Listing Mark Constitutes False Advertising, Unfair Competition, and a Threat to Public Safety.**

Section 43(a) of the Lanham Act provides a civil remedy to those damaged by one who makes a "false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics [or] qualities ... of his or her or another person's goods, services or commercial activities." 15 U.S.C. § 1125(a)(1)(B). Courts have interpreted this section of the Lanham Act as "providing 'protection against a myriad of deceptive commercial practices, including false advertising or promotion.'" *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000) (quoting *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1387 (5th Cir. 1996)). Because Section 43(a) is a "remedial statute," it is "broadly construed." *Gordon & Breach Science Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1532 (S.D.N.Y. 1994).

To prove a *prima facie* case of false advertising under Section 43(a), the plaintiff must demonstrate the following:

> (1) that the defendant has made false or misleading statements as to his own product or another's; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is likelihood of injury to the plaintiff in terms of declining sales, loss of goodwill, etc.

*Logan v. Burgers Ozark Country Cured Hams, Inc.*, 263 F.3d 447, 462 (5th Cir. 2001); *Pizza Hut*, 227 F.3d at 495; *see also*; *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, 2004 WL 833595,

at *17 (N.D. Tex. April 19, 2004).   A plaintiff may establish the materiality requirement by

proving that "the defendants misrepresented an inherent quality or characteristic of the product."

*Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (internal quotations

omitted).   In *Pizza Hut*, the Fifth Circuit reasoned that "with respect to materiality, when the

statements of fact at issue are shown to be literally false, the plaintiff need not introduce

evidence on the issue of the impact the statements had on consumers.   In such a circumstance,

the court will assume that the statements actually misled consumers." *Pizza Hut*, 227 F.3d at 497

(citing *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992); *see also*, *Healthpoint,*

*Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 856 (W.D. Tex. 2001) (same).   A claim under Texas

common law requires a showing of the same factors as used under the Lanham Act.   *Healthpoint*,

273 F. Supp. 2d at 855 n.216.

   To prevail on a claim of unfair competition under the Lanham Act, 15 U.S.C.

§ 1125(a)(1)(A), a defendant's false designations must be likely to cause mistake, or to deceive

as to the *sponsorship or approval* of goods by another person.   An action may be brought by

"*any person* who believes that he or she is or is likely to be damaged by such act." *See*, *e.g.*,

*MCW*, 2004 WL 833595, at *10 (quoting 15 U.S.C. § 1125(a)(1)(A) (emphasis added).   In

determining whether a likelihood of confusion exists, most courts evaluate the following factors:

"(1) the type of mark allegedly infringed, (2) the similarity between the two marks (3) the

similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the

identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual

confusion." *Id.* at *16.   Unauthorized use of a mark is not just unfair competition, but

counterfeiting. *See United States v. Zheng Xiao Yi*, 460 F.3d 623, 630-31 (5th Cir. 2006)

(criminal conviction for counterfeiting UL marks).

Unfair competition under Texas common law "is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (citation omitted). "The tort requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business." *Id.* An affirmative finding on Chemguard's federal false advertising and unfair competition claims, standing alone, would support a finding of unfair competition under state law. *Healthpoint, Ltd. v. Ethex Corp.*, 2004 WL 2359420, at *9 n.157 (W.D. Tex. July 14, 2004) (citation omitted).

Lastly, there is federal precedent for preliminary injunctions ordering the recall of product that unfairly competes in the marketplace. *See, e.g., Pem-America, Inc. v. Sunham Home Fashions, LLC*, 2003 WL 22964908, at *1, (2d Cir. Dec. 12, 2003); *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 212 (2d Cir. 1999) ; *Hukafit Sportswear v. Banff, Ltd.*, 1985 WL 5943, at *3-7 (S.D.N.Y. 1985) (collecting cases).

**C.      There is a Substantial Likelihood that Chemguard will Succeed on the Merits of Its Claims.**

   **1.      Misuse of a UL Listing Mark and Control Number constitutes false advertising and unfair competition.**

U.S. Foam has falsely represented that at least two of its products are UL Listed when they are not. U.S. Foam cannot legitimately dispute that the First Strike A/B and First Strike 3% AFFF-MS products are not listed by UL but yet U.S. Foam has marked its products with the UL Listing Mark. These U.S. Foam statements are literally false. There can be no doubt that potential customers will likely be confused as to whether these products are UL Listed as the relevant consuming public relies on, among other sources, the product packaging and literature. *See* Appendix at Page 56-7, ¶ 13 and Pages 207-212 (Prejean, Schaumburg and Darley Declarations). These false statements are likely to deceive, and in the case of the City of

Fountain, have already deceived the purchaser into believing that the product was UL Listed. U.S. Foam's First Strike A/B and First Strike 3% AFFF-MS are sold in interstate commerce. *See* Appendix at Page 6, ¶ 12. Accordingly, the sale of U.S. Foam product with the counterfeit UL Listing Mark's constitutes false advertising under 15 U.S.C. § 1125(a)(1)(B) and Texas common law. *See, e.g., Burndy Corp. v. Teledyne Indus., Inc.*, 584 F. Supp. 656 (D. Conn. 1984) (manufacturer violated Lanham Act by falsely advertising that its electrical connectors complied with UL standards).

In addition, such misuse of the UL Listing Mark constitutes unfair competition as the relevant consuming public is likely to be deceived as to the sponsorship or approval of U.S. Foam's First Strike A/B and 3% AFFF-MS by UL when they are not. U.S Foam is using the exact same UL Listing Mark as that used on similar products actually approved by UL. Therefore, the likelihood of consumer confusion is extremely high. Indeed, U.S. Foam's improper usage of the UL Listing Mark constitutes criminal counterfeiting. *See, e.g., Yi*, 460 F.3d 623, 630-31.

In addition, U.S. Foam's use of Chemguard's and Ansul's UL control number constitutes a false designation of origin. No U.S. Foam product is made by Chemguard or Ansul. U.S. Foam's conduct involves false designation of origin since these control numbers are used to specifically identify the physical manufacturing facility from which fire-fighting foam originates.

Based on the above facts, U.S. Foam's use of the UL Listing Mark and its competitors' control numbers constitute unfair competition under 15 U.S.C. § 1125(a)(1)(A) and Texas common law.

2.    **Misrepresenting that a Product Meets MIL-F-24385F when it does not Constitutes False Advertising, Unfair Competition, and a Public Health Threat.**

U.S. Foam has falsely represented that First Strike 3% AFFF-MS meets the stringent military standard MIL-F-24385F when it does not. Tests show that First Strike 3% AFFF-MS significantly fails the fire suppression test under the standard. U.S. Foam's representations to the contrary constitute false statements that are likely to deceive a substantial portion of customers into believing that the product meets MIL-F-24385F. *See* Appendix at Pages 6-7, ¶ 13 and Pages 207-212 (Prejean, Schaumburg and Darley Declarations). The deception is material in that customers rely on the product literature and packaging when making purchasing decisions. *See* Appendix at Page 206, ¶ 13, Pages 207-212. U.S Foam's First Strike 3% AFFF-MS has traveled in interstate commerce. *See* Appendix at Page 6, ¶ 12. The sale of U.S. Foam's First Strike 3% AFFF-MS marketed with false statements indicating that the product has met MIL-F-24385F has and will continue to injure Chemguard in terms of lost sales. *See* Appendix at Pages 5-6, ¶¶ 9-10. U.S. Foam's sales of First Strike 3% AFFF-MS also constitutes unfair competition under Texas common law as the act is a tort that interferes with Chemguard's ability to do its business. *Taylor Publ'g*, 216 F.3d at 486. Importantly, as discussed above, the products that do not meet MIL-F-24385F, such as U.S. Foam First Strike 3% AFFF-MS, endanger the public and firefighters. *See* Appendix at Page 17, ¶ 45. In addition, there is harm to Chemguard through incalculable lost sales due to U.S. Foam's false statements. *See* Appendix at Page 18, ¶ 46.

3.    **Misrepresenting the Performance of First Strike A/B Constitutes False Advertising, Unfair Competition, and a Public Health Threat.**

U.S. Foam's has falsely represented that First Strike A/B is essentially an all-in-one fire-fighting foam concentrate that is equally suitable for Class A and Class B fires. *See* Appendix at

Page 18, ¶ 47, Exhibit AC (Page 200).  As discussed above, mixing Class A foam concentrates and Class B foam concentrates usually destroys or greatly reduces the effectiveness of both and could produce a potentially hazardous situation.  *See* Appendix at Page 19, ¶ 49.  Moreover, a dangerous situation could be created if firefighters mixed the U.S. Foam First Strike A/B , which has Class A foam concentrate properties, with a Class B foam concentrate and expected it to perform like a pure Class B foam concentrate.  *Id.* at ¶ 50.

Lastly, the U.S. Foam First Strike A/B has questionable efficacy as a Class A foam concentrate.  Testing shows that the U.S. Foam First Strike significantly failed the U.S. Forest Service Specification 5100-307a, taking **approximately 73 times longer** than the maximum allowed time to wet a source of fuel material.  *See* Appendix at Page 18, ¶ 48.

U.S. Foam's statements about First Strike A/B constitute false advertising and unfair competition that will likely deceive a significant portion of relevant customers.  In fact, Chief Daniels at the City of Fountain Fire Department has already been deceived by these statements.  These misleading statements interfere with Chemguard's ability to conduct its business.

**D.    Primarily, a Temporary Restraining Order And Preliminary Injunction Will Serve, not Disserve, the Public Interest.**

This factor, typically discussed last, is an important factor to Chemguard, because U.S. Foam's false advertising and misrepresentations place the public and firefighters at significant risk.  The public has an interest in fire-fighting foam performing as expected and to be correctly and truthfully labeled.  U.S. Foam is selling product that it claims meets MIL-F-24385F but does not.  U.S. Foam is also selling product that is not truthfully labeled, either by counterfeiting the UL Listing Mark, use of a competitor's UL control number, or both.  In addition U.S. Foam's First Strike A/B will not necessarily perform as a UL Listed Class A or Class B foam concentrate would perform individually.  These factors will likely lead to instances where lives depend upon

U.S Foam's foam concentrate to perform as a correctly certified product would perform and U.S. Foam's product will come up short. This issue should be addressed before a major catastrophe occurs – one which would likely be intensified by U.S. Foam's defective product. The results could be devastating, with loss of life and property. This threat to public safety alone is grounds for issuing a temporary restraining order and preliminary injunction. *See, e.g., Playskool, Inc. v. Product Development Group, Inc.*, 699 F. Supp. 1056, 1063 (E.D.N.Y. 1988) (issuing preliminary injunction including recall because misleading language created a potential safety hazard); *Save our Summers v. Washington State Dept. of Ecology*, 132 F. Supp. 2d 896, 909 (E.D. Wash. 1999) (evidence showing that agricultural burning may pose a significant threat to public health favors issuance of temporary restraining order, denying order on unrelated jurisdictional grounds); *Heather K. v. City of Mallard*, 887 F. Supp. 1249, 1260 (N.D. Iowa 1995) (TRO issued in view of threat to health and life from particulates resulting from open burning; *see also, Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 479 F. Supp. 2d 968, 994 (N.D. Iowa 2007) (noting that in the Eighth Circuit that the public interest favors enjoining false statements and enjoining safety risks arising from false labeling of products) (citation omitted); *see also, United States v. Lit Drug Co.*, 333 F. Supp. 990, 992 (D.N.J. 1971) (preliminary injunction and recall of adulterated and misbranded drugs). Thus, an interlocutory injunction will preserve the status quo where the public and firefighters have not been injured by defective and falsely labeled product.

In addition, "[t]he public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act ...." *Petro Franchise Systems, LLC v. All Am. Properties, LLC*, 607 F. Supp. 2d 781, 797 (W.D. Tex. 2009) (citing *Quantum Fitness Corp. v. Quantum Lifestyle Cent., LLC*, 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999).

1. **Chemguard and the Public will Suffer a Substantial Threat of Irreparable Harm if an Injunction is Not Entered.**

The public is being exposed to needless risk everyday that U.S. Foam's falsely labeled and deficient products are being sold. Moreover, the public is at risk everyday that U.S. Foam's products are being stored for use in the event of a future fire. Should U.S. Foam's products fail the firefighters that use them, the public and the firefighters may be injured or killed and thus irreparably harmed. This ground alone is sufficient to find a threat of irreparable harm.

In the commercial context, because it is "virtually impossible to prove that so much of one's sales will be lost as a direct result of a competitor's advertisement," a demonstration that a competitor's advertising tends to mislead consumers satisfies the irreparable harm requirement. *See Black & Decker, Inc. v. Pro-tech Power, Inc.*, 26 F. Supp. 2d 834, 862 (E.D. Va. 1998); "When injunctive relief is sought under the Lanham Act, the finding of a tendency to deceive satisfies the requisite showing of irreparable harm." *Healthpoint, Ltd. v. Stratus Pharms., Inc.*, 273 F. Supp. 2d 769, 813 (W.D. Tex. 2001) (citation omitted); *see also, Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772 (2d Cir. 1984) (permanent injunctive relief granted upon proof of the likelihood that purchasers of the product may be misled by the false advertising). Here, Chemguard has shown that U.S. Foam's representations regarding UL Listings, UL control numbers, and whether certain product meets MIL-F-24385F are literally false and not only have a tendency to deceive, but have actually deceived customers. In addition, Chemguard has demonstrated that U.S. Foam's representations regarding U.S. Foam's First Strike A/B are literally false and likely to mislead and confuse customers. Thus Chemguard has shown a threat of irreparable harm.

**2.      The Threatened Injury to Chemguard and the Public Outweighs Any Injury U.S. Foam May Suffer if a Restraining Order is Issued.**

Although U.S. Foam will suffer harm if a temporary restraining order and preliminary injunction are issued, U.S. Foam's pattern of false advertising, and its threat to public safety, tips the balance of the equities in favor of granting an injunction.   Here, without a temporary restraining order and preliminary injunction, the public and firefighters will be exposed daily to possible devastating injury and loss of life.   Alternatively, if U.S. Foam is enjoined from engaging in false advertising and mislabeling its products, it will be forced to compete fairly in the marketplace as it should be doing in the first place and exit markets where it cannot produce compliant, safe products.   Moreover, the costs in lives and damages to property vastly outweigh the costs for U.S. Foam to correct its labeling and product literature.   Whatever refunds U.S. Foam must make due to recalling its mislabeled product should not prohibit a recall because (1) those sales would not have been made in the first place but for the false advertising; and (2) as long as the product remains with customers, a disaster could occur by product failure..

**E.      The Court Should Issue a Restraining Order With No Bond Requirement, or Only a Nominal Bond Requirement.**

Rule 65(c) provides that no injunction "shall issue except upon the giving of security by the applicant, in such sum as the court deems proper ...."   The Fifth Circuit has held that "the amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,'" and recognized that a district court "'may elect to require no security at all.'"   *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citations omitted).   Here, Chemguard submits that the Court should dispense with a bond requirement for issuance of a restraining order or set a nominal bond because the evidence strongly favors a finding of false advertising and unfair competition and impaired public safety.   *California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985) ("the likelihood of success on the

24

merits, as found by the district court, tips in favor of a minimal bond or no bond at all.")  Here, Chemguard submits that any damage to U.S. Foam is of its own making and is greatly outweighed by the danger to the public and to firefighters by U.S. Foam's failure to meet safety standards.  If the Court finds that some amount of security should be required, Plaintiff submits that a nominal amount is all that should be required.

## III.
## CONCLUSION

For the reasons set out above, Chemguard requests that the Court enter a Temporary Restraining Order (a) prohibiting U.S. Foam, the other defendants, and all those acting in concert with U.S. Foam, from offering for sale or selling any products that (i) falsely bear a UL Listing Mark or UL control number, (ii) falsely claim to meet MIL-F-24385F, and (iii) any products that claims to be a combined Class A/Class B foam concentrate that performs as well as either a Class A foam concentrate or Class B concentrate would perform individually; (b) that U.S. Foam be required to notify all purchasers of products which were falsely labeled as being UL approved or falsely described as meeting military specifications of the false labeling and misrepresentations; (c) that U.S. Foam recall all product that fails to meet the minimum safety standards that U.S. Foam falsely represented were met; and (d) granting Chemguard such other and further relief to which it may be justified.

Respectfully submitted,


/s/ Craig W. Weinlein
**Craig W. Weinlein**
Texas State Bar No. 21095500
cweinlein@ccsb.com
**Prescott W. Smith**
Texas State Bar No. 24013534
psmith@ccsb.com
**CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, LLP**
901 Main Street
Dallas, Texas 75202
(214) 855-3094; FAX (214) 953-5822

*Of Counsel:*

**Kirk W. Watkins**
kwatkins@wcsr.com
Atlantic Station
271 17th Street NW
Suite 2400
Atlanta, Georgia 30363
**Jacob S. Wharton**
jwharton@wcsr.com
One West Fourth Street
Winston-Salem, North Carolina 27101
**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
(404) 888-7414; FAX (404) 870-4836

**ATTORNEYS FOR PLAINTIFF**